[No. A134896. First Dist., Div. Three. July 25, 2013.]

MASONITE CORPORATION, Plaintiff and Appellant, v.
COUNTY OF MENDOCINO et al., Defendants and Respondents;
GRANITE CONSTRUCTION COMPANY, Real Party in Interest and
Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.D., II.E., and II.F.

COUNSEL

DowneyBrand, Christian Lucier Marsh; Briscoe, Ivester & Bazel and David Ivester for Plaintiff and Appellant.

Jeanine B. Nadel, County Counsel, and Terry Nan Gross, Deputy County Counsel, for Defendants and Respondents.

Harrison Temblador, Hungerford & Johnson and Mark David Harrison for Real Party in Interest and Respondent.

Nancy C. McDonough and Christian C. Scheuring for California Farm Bureau Federation as Amicus Curiae.

OPINION

SIGGINS, J.—Masonite Corporation (Masonite) appeals from a judgment denying its petition for writ of mandate to set aside approvals by Mendocino County (County) of the Kunzler Terrace Mine Project (Project) to be developed by Granite Construction Company (Granite; Granite and the County are hereafter referred to collectively as respondents), and the final environmental impact report (EIR) for its Project, for failure to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

Masonite argues the approval process and the EIR were deficient in several ways. The County was required to recirculate the EIR because the Project as approved had significantly greater impacts than the one originally proposed. Recirculation was also required because the EIR disclosed a new significant impact on the foothill yellow-legged frog (Frog) that was not adequately mitigated. The County erroneously determined that conservation easements and in-lieu fees were not feasible ways to mitigate the loss of prime farmland due to the Project. The EIR did not adequately analyze the Project's cumulative impacts on agricultural resources. The County failed to adopt adequate measures to mitigate significant impacts from truck traffic along a private road associated with the Project. And finally, the EIR failed to adequately evaluate Project alternatives.

We agree with Masonite's contentions involving recirculation for comment on possible mitigation measures that can protect the Frog; the infeasibility of agricultural conservation easements and in-lieu fees; discussion of cumulative impacts on farmland; and mitigation measures for truck traffic. Accordingly, we reverse the judgment denying the petition for writ of mandate, with directions that the County set aside its certification of the EIR, and prepare and circulate a supplemental EIR that addresses the errors we identify.

## I. BACKGROUND

The Project is a sand and gravel quarry to be developed on 65.3 acres approximately one mile north of Ukiah. The site is bordered on the north by Ackerman Creek, on the east by the Russian River, on the south by property owned by Masonite, and on the west by Kunzler Ranch Road. Most of the site is cultivated as a vineyard, with an open space portion in the northeast and a truck maintenance shop at the northwest corner. Forty-five acres of the site's 65 acres are classified as "prime farmland," but the site has been zoned for industrial use since 1982. It is surrounded by a lumber mill to the north of Ackerman Creek, agricultural land to the east of the Russian River, Masonite's industrial property to the south (described as "vacant" on area maps), and industrial and commercial properties to the west.

Granite plans to extract 3.37 million tons of aggregate from 30.3 acres of the site over a 25-year period. The mine is designed to operate year round, six days a week, 14 hours a day.[1] The mining will be done in phases to allow for concurrent site reclamation, and five years of reclamation are planned after the mining operations are complete. Following reclamation, the northwestern portion of the property will be available for future industrial uses, and the rest of the site will be "open space (ponds)."

---

[1] Granite advised at the County Board of Supervisors hearing on the Project that, in response to comments from the California Regional Water Quality Control Board, North Coast Region, it agreed to suspend mining during the wet season between November and March.

Granite submitted an application to the County for approval of a conditional use permit and reclamation plan for the Project in February 2008. The County determined that an environmental impact report was required, solicited comments from government agencies in April 2008, and noticed preparation of a draft environmental impact report (Draft) in October. The Draft was released for public and agency review in September 2009. Among those who commented critically on the Draft and the Project were SCS Engineers on behalf of Masonite, and Russian Riverkeeper, an organization dedicated to protection of the Russian River environment.

The EIR was released for review on May 3, 2010. The EIR identified two significant and unavoidable Project impacts: the permanent loss of prime farmland and traffic problems that would develop by the year 2030. The EIR came before the County Planning Commission on May 20, 2010. After considering public comments, including those on behalf of Masonite, the planning commission certified the EIR and approved the use permit and reclamation plan. The planning commission adopted a statement of overriding considerations noting, among other things, that the Project would provide "a reliable 20-year supply of construction aggregate in the Mendocino County area."

Masonite and Russian Riverkeeper appealed the planning commission decisions to the County Board of Supervisors. The appeals were heard by the board on July 27, 2010. The day of the hearing, Masonite filed a 49-page letter brief challenging the EIR on approximately 20 grounds. The board denied both appeals.

Masonite and Russian Riverkeeper filed petitions for writ of mandate seeking to overturn the County's approval of the Project due to violations of CEQA. The petitions were denied, and Masonite and Russian Riverkeeper appealed from the judgments. Russian Riverkeeper's appeal was dismissed after settlement.

## II. DISCUSSION

### A. *Scope of Review*

"In reviewing an agency's compliance with CEQA . . . the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's:

The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the County and whether it contains substantial evidence to support the County's factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709], fn. omitted.)

B. *Recirculation of the EIR*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *Mitigation for Loss of Prime Farmland*

Forty-five acres of the Project site are prime farmland, meaning they are "designated by the Department of Conservation FMMP [(Farmland Mapping and Monitoring Program)] as prime farmland, farmland of statewide importance, or unique farmland." One of the significant unavoidable effects of the project identified in the Draft is the loss of these 45 acres of prime agricultural land. Masonite contends that the County erred when it determined that no mitigation was feasible for the loss of this prime farmland. Masonite argues that this impact could have been mitigated by acquisition of agricultural conservation easements on offsite properties, or payment of "in-lieu" fees to fund such acquisitions.

(1) *Record*

The Draft explained why this impact could not feasibly be mitigated: "Mitigation for agricultural resources may take the form of avoidance, minimization, restoration, preservation, or compensation (providing substitute resources off-site). These forms of mitigation correspond to CEQA *Guidelines* Section 15370.[5] For the proposed project, avoidance is not possible, as the location of the mineral resources corresponds to the prime farmland as identified in the FMMP. Minimization is incorporated into the project to an extent, as the project is phased, and agricultural activity will continue on a

---

\*See footnote, *ante*, page 230.

[5] This guideline provides: " 'Mitigation' includes: [¶] (a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e) Compensating for the impact by replacing or providing substitute resources or environments." (Cal. Code Regs., tit. 14, § 15370) (the CEQA Guidelines in Cal. Code Regs., tit. 14, § 15000 et seq. are hereafter cited as Guidelines).

phase until it is mined, thus extending agricultural activity during the life of the project. . . . However, this will not reduce the impact to less than significant. Restoration is infeasible, as the mining will result in a finished grade below the groundwater level. Preservation in this instance, is similar to avoidance, and is infeasible for the same reason. Compensation generally takes the form of off-site acquisition of farmland, typically an Agricultural Conservation Easement (ACE). Acquisition of an ACE is considered infeasible for the proposed project for the reasons discussed below.

"An ACE does not replace the on-site resources, but rather, it addresses the indirect and cumulative effects of farmland conversion. Indirect effects include the pressure created to encourage additional conversions, as development pressure raises the speculative value of the land and increases the economic costs of farming due to land use incompatibilities (limitations on pesticide use, nuisance complaints due to dust and odor, vandalism, predation by domestic pets, increased traffic, etc.). Because the project site is surrounded by existing and vacant industrial uses, with the exception of the west side, it is unlikely that this project would affect neighboring agricultural uses. There are agricultural uses to the east, but they are separated by the natural barrier of the Russian River. In addition, the end use of the property is open space (including habitat), rather than urban developments. Open space is compatible with agriculture, and would not create indirect development pressure on agricultural lands.

"Therefore, feasible mitigation measures are not available, and this impact would be significant and unavoidable." (Italics & boldface omitted.)

The Department of Conservation (DOC) expressed concerns about the loss of agricultural lands as an unavoidable impact of the Project in its comments on the Draft. According to the DOC, the loss should have been minimized through the acquisition of agricultural conservation easements (ACEs) on comparable land of at least equal size. The DOC considered this means of mitigation to be a common and appropriate means of mitigating the loss of prime farmland. According to the DOC: "Mitigation via agricultural conservation easements can be implemented by at least two alternative approaches: the outright purchase of easements or the donation of mitigation fees to a local, regional or statewide organization or agency whose purpose includes the acquisition and stewardship of agricultural conservation easements. The conversion of agricultural land should be deemed an impact of at least regional significance. Hence, the search for replacement lands should be conducted regionally or statewide, and not limited strictly to land within the project's surrounding area."

The County did not respond to these comments except to note that no Williamson Act (Gov. Code, § 51200 et seq.)[6] contracts would be affected by the Project, and cite to the discussion of mitigating lost farmland in the Draft. The Draft's discussion of the infeasibility of such mitigation was incorporated into the EIR without change.

When Masonite appealed the planning commission decisions to the board of supervisors, it said there was no "logical basis" for the conclusion that impacts to agricultural land could not be mitigated. At the hearing on the appeal, a County representative responded that "[t]he basic purpose of an agricultural conservation easement is to avoid the secondary impacts that are associated with conversion of agricultural land. You know, sometimes considered the so called domino effect. As you extinguish operations, now you're putting development pressure on the next farmer and you're causing nuisance issues that are going to make life difficult for him and make it more likely that that operation is going to want to sell. . . . So that's really what you're doing because you're not replacing the resources. We can put an easement somewhere else but it[']s not going to recreate those few acres of prime farmland that are present on that site now. So that's how we approach that analysis and you have to look at the circumstances of the project. . . . The nearest active agricultural operation is across the Russian River, which acts as a natural barrier in terms of what I would call these nuisance or domino effects. . . . [S]o given that, the conclusion of County Staff was that an agricultural easement was not the appropriate response in this case."

(2) *Review*

(a) *Agricultural Conservation Easements*

CEQA provides that "public agencies should not approve projects as proposed if there are . . . feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (Pub. Resources Code, § 21002; see *id.*, § 21002.1, subd. (b) [agencies must mitigate significant effects of projects they approve "whenever it is feasible to do so"].) CEQA defines "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.) Agency findings regarding whether mitigation measures are feasible are generally reviewed for substantial evidence. (See,

---

[6] "A Williamson Act contract obligates the landowner to maintain the land as agricultural for 10 or more years, with resulting tax benefits. ([Gov. Code,] §§ 51240–51244.) Absent contrary action, each year the contract renews for an additional year, so that the use restrictions are always in place for the next nine to 10 years. (*Id.*, § 51244.)" (*Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 195 [123 Cal.Rptr.2d 708].)

e.g., *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 350–351 [118 Cal.Rptr.3d 182] (*Beaumont*).) But not in this case.

Here, the determination that no mitigation was feasible for the loss of farmland rested on a conclusion that offsite ACEs cannot mitigate for the land lost at the Project site because they would "not replace the on-site resources." The County presumed that ACEs were useful only to address "the indirect and cumulative effects of farmland conversion," and were not needed here because the Project would have no such effects. Thus, the finding of infeasibility in the EIR rested on the legal conclusion that while ACEs can be used to mitigate a project's indirect and cumulative effects on agricultural resources, they do not mitigate its direct effect on those resources. As respondents put it in the trial court: "Given the lack of indirect or cumulative agricultural impacts, the Draft EIR properly conclude[d] that agricultural conservation easements are legally infeasible." The legal feasibility of a mitigation measure is not a question of fact reviewed for substantial evidence but rather is an issue of law that we review de novo.

█ We disagree with respondents. We conclude that ACEs may appropriately mitigate the direct loss of farmland when a project converts agricultural land to a nonagricultural use, even though an ACE does not replace the onsite resources. Our conclusion is reinforced by the CEQA Guidelines, case law on offsite mitigation for loss of biological resources, case law on ACEs, prevailing practice, and the public policy of this state.

ACEs preserve land for agricultural use in perpetuity. (See Civ. Code, §§ 815.1, 815.2 [describing agricultural and other conservation easements]; Pub. Resources Code, § 10211 [defining "agricultural conservation easement"].) As the California Farm Bureau Federation (CFBF) observes in an amicus curiae brief advocating for the conclusion we reach: "The permanent protection of existing resources off-site is effective mitigation for [a project's direct, cumulative, or growth-inducing] impacts because it prevents the consumption of a resource to the point that it no longer exists. . . . If agricultural land is permanently protected off-site at, for example, a 1:1 replacement ratio, then at least half of the agricultural land in a region would remain after the region has developed its available open space." By thus preserving substitute resources, ACEs compensate for the loss of farmland within the Guidelines' definition of mitigation. (Guidelines, § 15370, subd. (e) [mitigation includes "[c]ompensating for the impact by replacing or providing substitute resources or environments"].)

There is no good reason to distinguish the use of offsite ACEs to mitigate the loss of agricultural lands from the offsite preservation of habitats for

endangered species, an accepted means of mitigating impacts on biological resources. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 278 [148 Cal.Rptr.3d 310] [loss of habitat mitigated by conservation of other habitat at a one-to-one ratio]; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 610–611, 614–626 [91 Cal.Rptr.3d 571] [mitigation by offsite preservation of two acres of existing habitat or creation of one acre of new habitat for each acre of habitat impacted by the project]; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794 [32 Cal.Rptr.3d 177] [mitigation by "off-site preservation of similar habitat"]; *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1038 [48 Cal.Rptr.3d 544] [purchase of a half-acre for habitat reserves for every acre of development]; see Kostka et al., Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2013) § 14.8, p. 692 (rev. 2/09) (Kostka) [acquisition and enhancement of species habitat provide a substitute resource under Guidelines, § 15370, subd. (e)].) Indeed, the DOC's comments on the Draft recognized that the rationale for ACEs in this case parallels that of established mitigation for loss of wildlife habitat.

Our conclusion is also supported by the relatively sparse case law involving ACEs. The case most closely on point is *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296 [140 Cal.Rptr.3d 459] (*Lodi*), which involved a project that, similar to the one here, converted 40 acres of prime farmland to other uses. The EIR determined that the impact on agricultural resources was unavoidably significant, and the developer was nonetheless required to mitigate the impact by obtaining an ACE over 40 other acres of prime farmland. (*Id.* at pp. 322–323.) Although the EIR observed that " 'such off-site mitigation would not avoid the significant impact resulting from the permanent loss of prime agricultural lands at the project site' " (*id.* at p. 323), the court noted that acquisition of the offsite ACE "would minimize and substantially lessen" that impact (*id.* at p. 324). The *Lodi* court's reasoning refutes respondents' theory that mitigation through use of an offsite ACE is not legally feasible.

In *Beaumont, supra,* 190 Cal.App.4th 316, the EIR for a housing development on land long used for agricultural purposes noted that there was " 'no feasible long-term mitigation [for the impact on agricultural resources] other than placing large blocks of farmland into conservation easements, Williamson Act preserve status, or other temporary protection or preservation plans.' " (*Id.* at p. 349 [italics omitted].) But the EIR rejected those mitigation measures as economically infeasible because the pace of urban development made long-term farming no longer financially viable, a conclusion that was upheld as supported by substantial evidence. (*Id.* at pp. 350–351, citing *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1269–1271 [15 Cal.Rptr.3d 176] [offsite preservation of agricultural land was infeasible

because of "the negative economics of long-term agriculture" in Orange County].) There would have been no need for the EIR or the court in *Beaumont* to address the economic feasibility of ACEs if, as respondents argue, ACEs are not legally feasible. Nor does *Beaumont* support respondents' claim that we should review the infeasibility determination in this case for substantial evidence. Because the County decided that ACEs were not a legally feasible means to mitigate the loss of farmland at the Project site, it never investigated whether ACEs were economically feasible, and there is no evidence to review.

*Building Industry Assn. of Central California v. County of Stanislaus* (2010) 190 Cal.App.4th 582 [118 Cal.Rptr.3d 467] (*Stanislaus*) involved a challenge to a county general plan that required developers of projects converting agricultural land to residential use to obtain ACEs on farmland of equal quality in the county at a one-to-one ratio, or pay "an in-lieu mitigation fee." (*Id.* at p. 588.) The court concluded that these mitigation requirements were reasonably related to the adverse public impact of such projects and thus an authorized use of the county's police power. The court observed that a residential project would not be approved "until the developer provides permanent protection of one acre of farmland for every acre of farmland converted to residential use. Agricultural conservation easements granted in perpetuity are the primary means of accomplishing this permanent protection requirement. . . . [¶] . . . [¶] . . . Although the developed farmland is not replaced, an equivalent area of comparable farmland is permanently protected from a similar fate." (*Id.* at p. 592.) *Stanislaus* teaches that ACEs are a reasonable means to mitigate the impact of a project that replaces agricultural land.

Moreover, it appears that ACEs are commonly used for that purpose. The DOC described ACEs in its comments as "accept[ed] and use[d] by lead agencies as an appropriate mitigation measure under CEQA," and the administrative record includes evidence that ACEs are so employed by a number of cities and counties. The EIR at issue in *Lodi* stated that acquisition of ACEs over acreage equal to the agricultural acreage lost due to a project is " 'standard for California communities.' " (*Lodi, supra,* 205 Cal.App.4th at p. 322.) " 'In addition to the City of Lodi, the following agencies in the surrounding area apply the 1:1 mitigation ratio: cities of Stockton and Elk Grove, counties of San Joaquin and Stanislaus, Tri-Valley Conservancy (Livermore/Alameda County).' " (*Ibid.*) This authority suggests that the County is an outlier in believing that ACEs cannot feasibly be used to mitigate the conversion of prime farmland to other uses.

██ We note finally that our Legislature has repeatedly stated the preservation of agricultural land is an important public policy. (Gov. Code, § 51220,

subd. (a) ["the preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources, and is necessary not only to the maintenance of the agricultural economy of the state, but also for the assurance of adequate, healthful and nutritious food for future residents of this state and nation"]; Pub. Resources Code, § 10201, subd. (c) ["Agricultural lands near urban areas that are maintained in productive agricultural use are a significant part of California's agricultural heritage. . . . Conserving these lands is necessary due to increasing development pressures and the effects of urbanization on farm-lands close to cities."]; Civ. Code, § 815 ["the preservation of land in its natural, scenic, agricultural, historical, forested, or open-space condition is among the most important environmental assets of California"].) The Legisla-ture has also declared that CEQA is intended to effectuate this public policy. (Stats. 1993, ch. 812, § 1, p. 4428 ["(a) Agriculture is the state's leading industry . . . . [¶] . . . [¶] (c) The conversion of agricultural lands to nonagricultural uses threatens the long-term health of the state's agricultural industry. [¶] (d) The California Environmental Quality Act plays an important role in the preservation of agricultural lands."].) To categorically exclude ACEs as a means to mitigate the conversion of farmland would be contrary to one of CEQA's important purposes. We agree with the CFBF that ACEs should not "be removed from agencies' toolboxes as available mitigation" for this environmental impact.

 For these reasons, the EIR's determination that ACEs are legally infeasible cannot be sustained. The economic feasibility of offsite ACEs to mitigate the Project's impact on the loss of 45 acres of prime farmland must be explored.

(b) *In-lieu Fees*

As an alternative to the outright purchase of ACEs, the DOC comment letter recommended "the donation of mitigation fees to a local, regional or statewide organization or agency whose purpose includes the acquisition and stewardship of [ACEs]." Masonite argues that the EIR was deficient because it did not address this suggestion. The County responds, saying it was legally precluded from accepting in-lieu fees because it does not have a comprehen-sive farmland mitigation program.

 We agree with Masonite that the EIR should have addressed the DOC comment and given reasons for rejecting the DOC's proposal. (Guidelines, § 15088, subds. (a) & (c) [responses with reasoned analysis are required].) Again, we are not persuaded by respondents' argument for legal infeasibility. The DOC was not advocating payment of in-lieu fees to a county program, but rather to third parties involved in acquiring and overseeing ACEs.

Whether the County lacks a comprehensive farmland mitigation program is immaterial, and does not explain why in-lieu fees are not feasible mitigation. This issue requires further analysis in the EIR.

D.–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The judgment denying the petition for writ of mandate is reversed, with directions to issue a writ requiring the County to set aside its certification of the EIR, set aside its approvals of the conditional use permit and reclamation plan for the Project, and prepare and circulate a supplemental EIR, which includes the EIR's provisions pertaining to the Frog, and addresses the deficiencies we have identified in the EIR concerning: the feasibility of ACEs and in-lieu fees as mitigation for the Project's conversion of farmland to nonagricultural use; the discussion of cumulative impacts on agricultural resources; and the efficacy of the mitigation measures for truck traffic on Kunzler Ranch Road. Costs on appeal to Masonite.

McGuiness, P. J., and Pollak, J., concurred.

---

[*]See footnote, *ante*, page 230.